STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

WCA 05-560


EDDIE ANGELLE

VERSUS

TAYLOR OILFIELD


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF LAFAYETTE, NO. 03-01438
PAMELA MOSES-LARAMORE, WORKERS' COMPENSATION JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED IN PART; REVERSED IN PART; AND AMENDED.**


**Charles A. Mouton**
**Mahtook & Lafleur**
**P. O. Box 3089**
**Lafayette, LA 70502**
**(337) 266-2189**
**Counsel for Defendants/Appellees:**
**Taylor Oilfield**
**Alaska National Insurance Company**

**Richard E Smith**
**The Glenn Armentor Law Corporation**
**300 Stewart Street**
**Lafayette, LA 70501**
**(337) 233-1471**
**Counsel for Plaintiff/Appellant:**
**Eddie Angelle**

**EZELL, JUDGE**.

In this workers' compensation case, Eddie Angelle appeals a judgment which found his temporary total disability benefits were appropriately terminated. Angelle also appeals the workers' compensation judge's decision that he failed to prove his entitlement to supplemental earnings benefits in addition to an issue of timely payment of medical benefits.

**FACTS**

Angelle was employed by Taylor Oilfield as a machinist. Specifically, Angelle worked with a lathe producing oilfield connections. On August 24, 2001, Angelle was injured during the course and scope of his employment when a chuck flew out of the machine and lacerated his left forearm. As a result of the injury, Angelle was admitted to Lafayette General Medical Center where Dr. Christopher Lee performed a surgical procedure to repair a complex laceration of the left forearm in addition to repairing the extensor carpi ulnaris muscle and extensor digitorum muscle. Dr. Lee's operative report noted that Angelle could potentially have a good deal of skin loss.

Angelle was referred to Dr. Cynthia Glass, a plastic surgeon, on September 11, 2001, for daily wound care and debridement. On October 3, Dr. Glass performed a skin graft on the wound site, using skin from Angelle's left leg. As of January 16, 2002, Dr. Glass indicated that there was near total healing of Angelle's graft. She further suggested that Angelle see an orthopedic surgeon, because, while the skin graft might be successful, he might still have a functional deficit.

On January 15, 2002, Angelle was evaluated by Dr. Michel Heard, an orthopedic surgeon. At that time, Dr. Heard did not feel that Angelle was capable of working, obviously opining that Angelle did have a functional deficit. Dr. Heard continued following Angelle and recommended physical therapy. As of May 22, 2002, Dr. Heard

1

approved Angelle for light and sedentary activities. On November 4, 2002, Dr. Heard opined that Angelle was still unable to work but recommended a functional capacities evaluation (FCE).

On December 9 and December 11, 2002, an FCE was performed on Angelle at Louisiana Physical Therapy. The results of the FCE indicated that Angelle could work at a heavy level. Dr. Heard acknowledged the results of the FCE at Angelle's February 18, 2003 visit and recommended EMG/NCV studies of the left arm.

Based on the results of the FCE, Taylor Oilfield hired William Stampley, a vocational rehabilitation counselor, to establish Angelle's ability to return to work at his previous position. Stampley worked with the senior machinist at Taylor Oilfield and reviewed the steps that Angelle would take in performing his job. Stampley determined that the Angelle's job was toward the middle or lower end of medium-duty work and that Angelle was capable of returning to his former position.

On January 24, 2003, Angelle's temporary total disability benefits (TTD) were terminated. Angelle filed a disputed claim for compensation with the Office of Workers' Compensation on February 20, 2003, claiming that Taylor Oilfield's action in terminating his benefits was arbitrary and capricious. Taylor Oilfield was insured by Alaska National Insurance Company who was also named as a defendant. Therefore, our references to Taylor Oilfield in the opinion will include both defendants.

The case proceeded to trial before Workers' Compensation Judge Sharon Morrow. After trial, she requested a torque measurement assessment of the actual maximum weights that Angelle's job required. Prior to ruling, she recused herself and Workers' Compensation Judge Pamela Moses-Laramore was appointed to the case.

2

Workers' Compensation Judge Pamela Moses-Laramore had a status conference with the parties, reviewed the trial transcript, and requested post-trial briefs. She determined that she did not need further information to make her decision. On January 7, 2005, she issued her ruling. The Workers' Compensation Judge (WCJ) found that Angelle was able to return to work based on the FCE, which results she found were acknowledged by Dr. Heard. The WCJ found that supplemental earnings benefits (SEB) was the appropriate consideration for Angelle since he was no longer entitled to TTD. The WCJ then found that the record was devoid of any evidence to suggest that Angelle was entitled to SEB. The WCJ further found that there was no arbitrary or capricious behavior in terminating Angelle's benefits. Lastly, the WCJ found that the record was devoid of any evidence that medical benefits were not paid timely. Angelle appeals all of these findings.

**DISABILITY BENEFITS**

Angelle argues that he is presently disabled due to left elbow problems. He contends that when his TTD benefits were discontinued there was no evidence that he could return to work and that regular treatment by a doctor was still required.

We are mindful of the well-settled rule that factual findings in a workers' compensation case are subject to the manifest error standard of review. *Winford v. Conerly Corp.*, 04-1278 (La. 3/11/05), 897 So.2d 560. Furthermore, "[t]he Workers' Compensation Act is to be liberally construed in favor of protecting workers from the economic burden of work-related injuries." *Id*. at 564.

An employee is entitled to temporary total disability benefits if he sustains a work-related injury "producing temporary total disability . . . to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and

3

whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience." La. R.S. 23:1221(1)(a). When such an employee is not working, TTD compensation is proper "only if the employee proves by clear and convincing evidence, unaided by any presumption of disability," that he is physically unable to engage in any employment or self-employment, "including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain." La.R.S. 23:1221(1)(c). "To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence." *Hawthorne v. Louisiana Dept. of Agric. & Forestry*, 03-1162, p.2 (La.App. 3 Cir. 2/4/04), 866 So.2d 347, 348 (*quoting Hagan v. LSU Med. Ctr.*, 28,669, p.6 (La.App. 2 Cir. 9/27/96), 681 So.2d 971, 975.

Angelle would have this court apply La.R.S. 23:1221(1)(d) in determining whether he is still entitled to TTD. We note that no previous award of workers' compensation benefits had been made. Taylor Oilfield voluntary paid TTD after the accident, so La.R.S. 23:1221(1)(d) would not be applicable. See *Collins v. Patterson Drilling*, 39,668 (La.App. 2 Cir. 5/11/05), 902 So.2d 1264, which held that La.R.S. 23:1221(1)(d) was not applicable when an employer terminated TTD which had been voluntarily paid as opposed to payment by court order.

The FCE was performed on December 9 and December 11, 2002. The report noted that Angelle demonstrated a good effort during the evaluation. The FCE results indicated that Angelle can work at a heavy work level. However, the FCE also indicated that Angelle had restrictions: knuckle-to-shoulder lifting was restricted to fifty-three pounds maximum, floor-to-knuckle lifting was restricted to ninety pounds

4

maximum, and, finally, two-handed carrying was also restricted to ninety pounds maximum.

These results were presented to Dr. Michael Duval, an orthopedist who saw Angelle on one occasion on March 7, 2002, on behalf of Taylor Oilfield. Dr. Duval also had the benefit of a full-duty job assessment of a machinist with Taylor Oilfield. However, the information was not presented to Dr. Duval until March 3, 2003, which was several weeks after the January 24, 2003 termination of Angelle's TTD. Dr. Duval did opine that Angelle could return to his previous job. However, in March 2003, it had been a year since Dr. Duval personally saw Angelle in March 2002.

Taylor Oilfield never went to Dr. Heard for his approval of Angelle returning to his former position. As of Angelle's May 22, 2002 visit with Dr. Heard, Dr. Heard had not released Angelle to return to his previous job but approved him for light and sedentary activities as tolerated. At Angelle's June 25, 2002 visit, Dr. Heard encouraged him to continue with his part-time job. As of November 4, 2002, Dr. Heard continued to indicate that Angelle was not able to work at his job and recommended an FCE. On the February 18, 2003 visit, Dr. Heard reviewed the FCE and recognized that it indicated that Angelle could perform heavy work. No mention was made of Angelle's return to his job, but Dr. Heard did want further studies and requested EMG/NCV studies of the left upper extremity.

Angelle testified that he still has problems and does not feel he is capable of returning to work. He also stated that Dr. Heard wanted him to try to go back to work and admitted that he did do some work as a swamp boat tour captain for his cousin. Angelle further admitted that he could do very light-duty work.

Based on this evidence, we agree with the WCJ's conclusion that Angelle was not entitled to TTD benefits since he is obviously capable of some type of

5

employment, as even his treating physician recognized. Therefore, we will now review the WCJ's determination that Angelle was not entitled to SEB.

If an employee sustains a work injury that results in his inability to earn ninety percent or more of his average pre-injury wages, he is entitled to receive supplemental earnings benefits. *Banks v. Industrial Roofing & Sheet Metal Works, Inc.*, 96-2840 (La.7/1/97), 696 So.2d 551. Initially, the employee bears the burden of proving that the injury has resulted in his inability to earn that amount under the particular facts and circumstances of the case. *Id*. Once the employee meets this burden, the burden then shifts to the employer to prove that the employee is physically able to perform a job and that the job was available to the employee is his or the employee's community or reasonable geographic region. *Id*.

The WCJ found that the record was devoid of any evidence that Angelle is unable to earn wages equal to ninety percent or more of his pre-injury wage. While she recognized that Angelle testified that he could not work, except possibly at a light-duty position, she found that there was no evidence that he had tried to seek employment and been turned down. We agree with Angelle's argument that the WCJ found that any residual disability suffered by Angelle was associated with a 2000 accident in which Angelle dislocated his elbow.

Angelle agreed that he did help his cousin as a swamp tour guide on a couple of occasions, but testified that he would not be able to perform this job full time due to pain. His cousin, Terry Angelle, who owned the swamp boat tour company testified that Angelle operated the boat about fifteen times since he has been hurt, but he was never paid.

At the time benefits were terminated, the FCE indicated that Angelle could perform heavy work. However, there were restrictions placed on him that involved

6

lifting. Angelle testified that the machinist job at Taylor Oilfield is a heavy-duty job and he did not feel that he could perform the job because he is in pain and does not have the strength he once had.

Also, at the time benefits were terminated, no doctor had released Angelle to work. According to Dr. Heard's records, Angelle was unable to work at that time.

During the course of the present proceeding, Angelle was referred to Dr. Angela Mayeaux for an independent medical examination by the WCJ. Dr. Mayeaux noted the elbow injury in 2000 which required excision of the radial head on June 13, 2000. Angelle was treated in the University Medical Center Clinic until a last visit on August 14, 2000. Dr. Mayeaux opined that the 2000 incident led to degenerative arthritis in Angelle's left elbow. She recognized that the accident in 2001 left Angelle with some weakness in the extensor musculature, as well as the extensor lag, and that it did contribute to some disability. She also recognized his need for a total elbow replacement, but could not relate it directly to his work-related injury. However, Dr. Mayeaux did find that Angelle had permanent disability as a result of the accident finding that 18% of his permanent partial whole body disability was related to accident, at work. She determined that 25% of the disability was related to the fracture dislocation of the elbow for a total of 43% disability to his left upper extremity due to the two accidents.

Dr. Michael Duval, an orthopedist, saw Angelle on behalf of Taylor Oilfield for an evaluation. He reported Angelle's elbow injury as severe and ultimately requiring an elbow replacement at some point in his life. Dr. Duval, however, did not relate this to Angelle's accident at work. Dr. Duval did recognize that Angelle's injury at work to his left forearm caused a slight lag of the long and ring finger with some sensory numbness over the forearm distal to the laceration itself. He did not think this

7

impairment would cause Angelle any significant functional impairment since he is able to use his hand in a normal fashion.

We find that the WCJ committed manifest error in concluding that Angelle had not established his inability to earn ninety percent of his pre-injury wages at the time benefits were terminated. It is clear from the record that Angelle has a disability as a result of the accident that affects his ability to work.

In support of its determination that Angelle was not entitled to SEB, Taylor Oilfield enlisted the services of William Stampley, a vocational rehabilitation counselor, to determine if Angelle could return to his previous position. Stampley's assessment of Angelle's job found that it was toward the middle or lower end of medium and that the requirements were well below the findings of the FCE. Based on the FCE and Stampley's assessment, Taylor Oilfield decided to terminate Angelle's benefits.

A doctor's opinion on Angelle's ability to return to his former job was not even obtained until after Angelle's benefits were already terminated. Also, while Dr. Heard had the benefit of the FCE results as of February 18, 2003, Taylor Oilfield never sought his opinion on Angelle's ability to return to work. We realize that the WCJ assumed, based on Dr. Heard's recognition of the FCE results and his failure to state that Angelle was unable to work as he had stated in his notes from previous visits, that Dr. Heard would have signed off on Angelle's return to work at his former position. We find that this assumption is incorrect.

Dr. Heard may not have indicated his opinion on Angelle's ability to return to his former position. He did, however, request EMG/NCV studies of Angelle's left arm, noting that Angelle complained of severe pain in his left arm. Obviously, Dr. Heard wanted further testing before he decided on Angelle's ability to return to his former position. Even the WCJ ruled that Angelle should return to see Dr. Heard to

8

determine if Angelle needs any further medical treatment as a result of the accident.

When Dr. Duval issued his opinion about Angelle's ability to return to work, he had not seen Angelle in a year. While the FCE results indicate Angelle could return to heavy labor and Stampley's assessment of Angelle's job indicates it is medium-level work, we find that there is no medical evidence to support Angelle's return to his former position. Taylor Oilfield failed to make certain that Angelle was physically capable from a medical standpoint to perform his former work.

Therefore, we find that Taylor Oilfield failed to prove that Angelle is physically capable of performing his previous position at the time it discontinued benefits. We find that the WCJ erred in failing to find that Angelle was entitled to SEB. Since Angelle is unemployed and Taylor Oilfield offered no evidence of jobs within Angelle's physical limitations, we find that he is entitled to SEB calculated with a zero earning capacity. La.R.S. 23:1221(c)(I). *Landry v. Physicians Practice Management*, 00-1298 (La.App. 3 Cir. 4/4/01), 783 So.2d 619, *writ denied*, 01-1336 (La. 6/22/01), 794 So.2d 792. Since we conclude that Angelle is entitled to SEB, we find it unnecessary to address Angelle's evidentiary concerns.

### ARBITRARY AND CAPRICIOUS TERMINATION

Angelle also disagrees with the WCJ's decision that his benefits were not arbitrarily and capriciously terminated. He argues that Taylor Oilfield failed to properly investigate the claim.

Louisiana Revised Statutes 23:1201.2, in effect at the time of Angelle's accident, provided for the assessment of attorney fees when the employer's discontinuance of benefits was found to be arbitrary and capricious. Presently, La.R.S. 23:1201(I) allows for the assessment of penalties and attorney fees for the discontinuance of benefits. However, that provision was not effect at the time of Angelle's injury, so

9

Angelle would be entitled only to attorney fees if his benefits were arbitrarily and capriciously discontinued. *Williams v. Rush Masonry,* Inc., 98-2271 (La. 6/29/99), 737 So.2d 41; *Hutchinson v. Aldworth Co., Inc.*, 04-24 (La. App. 4 Cir. 11/10/04), 888 So.2d 1052, *writ denied*, 04-3037(La. 2/18/05), 896 So.2d 38.

"Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, pp. 8-9 (La. 12/1/98), 721 So.2d 885, 890. A WCJ's decision regarding penalties and attorney fees is a question of fact subject to the manifest error or clearly wrong standard of review. *Authement v. Shappert Engineering*, 02-1631 (La. 2/25/03), 840 So.2d 1181.

The WCJ did not award penalties and attorney fees finding that Angelle failed meet his burden of proving his entitlement to SEB. However, the WCJ did discuss Taylor Oilfield's actions in terminating Angelle's benefits as follows (original was in all caps):

> Am I satisfied that Mr. Stampley did the best job he could in performing the job analysis? No, I am not. I would have preferred that Mr. Stampley get more information for that job analysis in terms of seeing the person - - He did not mention anywhere in his testimony seeing the person who worked that job actually doing the job and actually doing the testing that would see how much pressure it would take to turn those chucks. I certainly agree with Mr. Smith, I find it very questionable and very disheartening that Mr. Stampley would suggest that the job analysis be sent to Dr. Duval instead of Dr. Heard. Dr. Heard was the treating physician. Dr. Heard is the only physician who would have any weight with regard to signing off on the job analysis. Dr. Duval [sic] saw Mr. Angelle one time. His approval or disapproval of the job analysis has absolutely no weight or little to no weight . . . .

We agree with the WCJ's assessment of the situation. We agree that the job assessment should have been sent to Dr. Heard. Furthermore, at the time benefits were terminated by Taylor Oilfield, Dr. Heard was of the opinion that Angelle could

10

not perform his former job so it was even more important to find out what Dr. Heard's opinion was. Additionally, even after reviewing the FCE, Dr. Heard wanted further testing, so this fact in and of itself should have alerted Taylor Oilfield to the fact that further investigation was needed.

We find that Taylor Oilfield's actions were arbitrary and capricious in that it never sought a release to work from the treating physician who wanted further studies. For this reason we find that Taylor Oilfield was arbitrary and capricious in terminating Angelle's benefits. Therefore, we find that attorney fees are appropriate.

Angelle has requested attorney fees for both the work done at the trial court level and the work performed on his behalf at the appellate level. "A number of factors are used to determine the amount of attorney fees to be awarded, including the degree of skill and ability exercised, amount of the claim, amount recovered, and the amount of time devoted to the case." *Colonial Nursing Home v. Bradford*, 02-588, p.12 (La.App. 3 Cir. 12/30/02), 834 So.2d 1262, 1271, *writ denied*, 03-364 (La. 4/21/03), 841 So.2d 802, *citing Naquin v. Uniroyal, Inc.*, 405 So.2d 525 (La. 1981).

It is obvious that a lot of effort went into preparing this case on behalf of Angelle. Many issues were involved and were thoroughly briefed at the trial court level and the appellate level. The case was tried before one WCJ and then briefed to a separate WCJ who rendered the opinion. We find that an award of $8,000 for the work done at the trial court level is reasonable and that an additional $2,500 is appropriate for the appellate work.

**MEDICAL BENEFITS**

Angelle was seen by Dr. Heard on January 15, 2002, for a first-time evaluation. The medical bill for this evaluation totaled $345. Angelle claims he submitted this bill to Taylor Oilfield on at least five occasions between January 15, 2002, and June 27,

11

2002, the date the bill was finally paid. He claims that the WCJ erred in finding that there was no evidence presented that the bill was not timely paid. The WCJ ruled that the record was devoid of any evidence to support a failure of untimely payment of medical expenses.

Louisiana Revised Statutes 23:1201(E) provides: "Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." Furthermore, La.R.S. 23:1201(F)(2) provides for an award of penalties and attorney fees for the failure to timely pay medical benefits unless the claim is reasonably controverted or the nonpayment results form conditions over which the employer had no control.

Angelle claims that Taylor Oilfield had notice of the charge because it was contained on numerous statements received from Dr. Heard's office. Reviewing Dr. Heard's medical records there is a billing profile which shows the charge of an office visit on January 15, 2002. It shows payment of the bill on June 27, 2002. Included in the records are Dr. Heard's narrative reports which, starting on January 29, 2002, have a notation at the bottom which indicates "Statement Enclosed". This statement is on all subsequent narrative reports except for the February 18, 2003 report. There is, however, no indication on the reports what information the statement contained, what charges were on the statement, and who actually received the statement. As observed by the WCJ, counsel for Angelle never inquired of the billing and payment situation when Amy Williamson, manager of Shuman Consulting Services who was the third-party administrator for Alaska National Insurance Company, was testifying.

We agree with the WCJ's finding that there is no evidence in the record that the bill was not timely paid. The record does not establish when the bills were sent to Taylor Oilfield.

12

Angelle further argues that Taylor Oilfield failed to authorize the EMG/NCV studies as recommended by Dr. Heard on February 18, 2003. "[A] failure to authorize treatment can result in the imposition of penalties and attorney fees except when the claim is reasonably controverted." *Authement*, 840 So.2d at 1187.

> With respect to an employer's responsibility for payment of medical expenses, La.R.S. 23:1203(A) requires an employer to provide all necessary medical treatment stemming from an employee's work-related injury. *See Schindler v. Orleans Reg'l Sec.*, 03-522 (La.App. 4 Cir. 12/3/03), 862 So.2d 1032. To recover medical expenses under La. R.S. 23:1203, the claimant must prove by a preponderance of the evidence that the expenses are reasonably necessary for treatment of a medical condition caused by the work injury. *Id.* In addition, an injured employee may recover expenses for medically necessary diagnostic tests recommended by his treating physician when needed to ascertain the appropriate course of treatment. *McCrary v. New Orleans Health Corp.*, 01-1632 (La.App. 4 Cir. 9/26/01), 798 So.2d 1085.

*Gibson v. Shaw Global Energy Servs.*, 04-547, p. 8 (La.App. 3 Cir. 10/27/04), 885 So.2d 707, 713, *writ denied*, 04-2920 (La. 2/4/05), 893 So.2d 876.

The WCJ was uncertain if the request for the studies was based on Angelle's previous elbow injury or the current accident. She suggested that Taylor Oilfield pay for Angelle to return to Dr. Heard to clarify this issue.

Dr. Heard's history from the February 18, 2003 visit provides:

> The patient is seen in follow-up for left elbow pain that is severe, constant over the dorsal proximal forearm with numbness. Cold weather increases the pain in his elbow and his arm stiffness. The pain awakens him nightly. He had a functional capacities evaluation that found him able to do heavy work.

Dr. Heard then recommended Angelle for EMG/NCV studies of the left upper extremity with Dr. Franklin and advised a recheck in three weeks.

It is obvious to this court that Dr. Heard required this further testing to check on the condition of both Angelle's elbow and forearm. As we previously discussed, Dr. Heard's notes establish his concern about Angelle's continuing pain. It is apparent

that Dr. Heard wanted further testing to definitely ascertain Angelle's condition and ability to return to work since the FCE indicated he could perform heavy work.

We find that Taylor Oilfield was unreasonable in failing to authorize the EMG/NCV studies. Since we have previously awarded attorney fees for Taylor Oilfield's improper termination of Angelle's benefits, there is no need to discuss that issue here. However, Angelle is entitled to a penalty for Taylor Oilfield's refusal to authorize the testing requested by Dr. Heard.

Taylor Oilfield has refused to authorize the testing for over forty days. Therefore, the appropriate penalty would be the maximum of $2,000. *LeJeune v. Trend Services, Inc.*, 96-550 (La.App. 3 Cir. 6/4/97), 699 So.2d 95.

For the reasons expressed in this opinion, we reverse the Office of Workers' Compensation's decision that Eddie Angelle was not entitled to supplemental earnings benefits when Taylor Oilfield terminated his benefits. We further find that Angelle is entitled to supplemental earnings benefits on a zero earning capacity basis.

We also amend the judgment to include a penalty of $2,000 and attorney fees in the amount of $8,000 for work at the trial level in addition to $2,500 for work done at the appellate level. In all other respects the judgment is affirmed. Costs of this appeal are assessed to Taylor Oilfield and Alaska National Insurance Company.

**AFFIRMED IN PART; REVERSED IN PART; AND AMENDED.**

14